# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| SAMUEL LEWIS TAYLOR, )<br>)<br>)<br>    Plaintiff, )<br>)<br>       vs. )<br>)<br>DAVID NULL, et al., )<br>)<br>    Defendants. ) | Case No. 4:17-CV-0231-SPM |

## MEMORANDUM AND ORDER

This matter comes before the Court on the motion for summary judgment filed by Defendants Bruce Milburn ("Milburn") and David Null ("Null"), (collectively, "Defendants"). (Doc. 63). Also before the Court is Plaintiff Samuel L. Taylor's ("Taylor" or "Plaintiff") motion for adverse inference. (Doc. 57). The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1). (Doc. 35). For the following reasons, the Court will deny Defendant's motion for summary judgment, and will grant Plaintiff's motion for adverse inference in part, and deny it in part.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff brings this action under 42 U.S.C. § 1983, asserting a claim of excessive use of force. At the time of the events giving rise to his complaint, Plaintiff was an inmate at the Potosi Correctional Center ("PCC"). Defendants were employed at PCC as corrections officers.

The following facts are either not in dispute or taken in the light most favorable to Plaintiff: Shortly before midnight on June 3, 2012, defendant Milburn and another corrections

1

officer, Kenneth Ruble ("Ruble") arrived at Plaintiff's cell in the general population wing. Once there, they ordered Plaintiff to perform a work assignment. When Plaintiff refused, Milburn ordered him to "lock down" in his cell for failure to obey the order. Plaintiff complied with the lockdown order; he never threatened the guards, and he never gave any indication that he was not fully complying. Milburn and Ruble then left the area.

Approximately twenty minutes later, Milburn and Ruble returned and ordered Plaintiff out of his cell and onto the main floor of the cellblock. Plaintiff complied without resistance. He was issued a conduct violation for failure to obey the order to perform his work assignment, and was informed that he was to be transferred to administrative segregation. Milburn or Ruble then handcuffed Plaintiff to a restraint bench. Plaintiff did not threaten the guards or resist being handcuffed to the bench. Ruble then walked away, positioning himself in a control center at the other end of the cellblock, from where he would have been able to see Plaintiff if he looked in that direction. Milburn picked up a metal lock that was attached by a chain to the restraint bench and proceeded to strike Plaintiff's right hand near the middle finger. There is no contention that Plaintiff resisted or threatened Milburn or Ruble before or after being hit with the lock. Plaintiff's finger was not broken, but he suffered bruising, soreness, and swelling of his hand.

Null arrived after the lock incident and escorted Plaintiff to the prison medical facility. Upon arrival, Plaintiff told the nurse that Milburn had struck him, but the nurse denied that the incident occurred and refused to note Plaintiff's injuries.

Null then escorted Plaintiff from the medical facility to the administrative segregation unit. As they were walking through a corridor, Null placed his hand on Plaintiff's head and shoved Plaintiff's face into a concrete wall. The force of the shove was sufficient to crack three of Plaintiff's teeth and cause his mouth to bleed. Plaintiff was not threatening Null or resisting

prior to that use of force. After placing Plaintiff in a cell, Null conducted a strip search. Plaintiff remained handcuffed throughout the search and did not resist. Nevertheless, Null punched Plaintiff twice in the jaw, causing it to swell. Null then left Plaintiff alone in the cell.

Shortly before dawn on June 4, Plaintiff obtained a medical service request form ("MSR"), which he used to request treatment for the injuries to his finger, face, and teeth. On June 5, in response to the MSR, a nurse came to Plaintiff's cell and observed him through a glass window. The nurse did not remove Plaintiff from the cell for evaluation at the nurses' station and she could only see plaintiff's face through the window. She did not open the food tray port, through which she could have evaluated Plaintiff's finger injury. Yet, the nurse reported performing a visual inspection, concluding that Plaintiff had no signs of injury and that his teeth were intact.

Plaintiff filed a second MSR, after which he was seen by a different nurse on June 8, several days after the incident. That nurse determined that Plaintiff's right middle finger was swollen and tender to the touch. She gave him Motrin, and referred him to a dentist for his teeth and to a doctor for his finger. On June 14, plaintiff was seen by a dentist, whose examination revealed that three of his teeth were chipped—injuries that were not present at Plaintiff's previous dental examinations. On June 27, twenty-four days after being hit with the lock, Plaintiff was examined by a doctor. The doctor reported no remaining soft tissue swelling or discoloration of Plaintiff's finger.

PCC's response to the intra-prison grievance Plaintiff filed reveals that video records existed of the areas in which the incidents allegedly occurred and for the timeframe in which they happened. Plaintiff requested preservation of and access to those video records. The video records have not been submitted in support of the defendants' motion for summary judgment,

and appear to no longer exist.

Plaintiff brought an earlier 42 U.S.C. § 1983 action against Defendants Null and Milburn.[1] *See generally* Case. No. 4:13-CV-1065-CEJ. That case, which was filed on June 4, 2013, and was presided over by now retired District Judge Carol E. Jackson of this district, was based on the same underlying circumstances as this case. During the course of that prior action, Defendants Milburn and Null brought a motion for summary judgment, in which they asserted arguments in support of their motion that are identical to the arguments Defendants assert in the instant case, *i.e.*, that Plaintiff failed to exhaust his intra-prison administrative remedies, that Plaintiff cannot prove that Defendants used excessive force against him in violation of the Eighth Amendment, and that Defendants are entitled to qualified immunity on Plaintiff's claims. *Id.*, Doc. 98.

Judge Jackson, in a thorough and well-reasoned order issued on July 22, 2015, found that "a genuine dispute of material fact exist[ed] regarding whether Taylor properly exhausted his claims," and "[t]herefore, defendants are not entitled to summary judgment on that basis." *Id.*, Doc. 132 at 5. With regard to Taylor's allegations that Milburn used excessive force against him, Judge Jackson noted that "[b]ecause no evidence from disinterested witnesses has been submitted to rebut Taylor's allegations, and because Milburn has not produced the video records," a "genuine dispute of material fact remains regarding whether Milburn used excessive force on Taylor by striking him with a lock." *Id.* at 6. As to Taylor's allegations against Null, Judge Jackson found that "[t]he Court's analysis with regard to Milburn applies with equal force to Null. Null, like Milburn, cites only affidavits to support his assertion that he did not use any

---

[1] In the previous action, correctional officer Ruble, as well as two nurses who examined Plaintiff, were named as defendants. Summary judgment was entered in their favor in that action. *See* Case. No. 4:13-CV-1065-CEJ, Docs. 132, 176.

4

force on Taylor," which "Taylor counters with his deposition and affidavit." *Id*. at 9. Judge Jackson went on to state that "[g]iven the competing testimony and in the absence of the video records of Null's interactions with Taylor, a genuine dispute of material fact exists regarding whether Null shoved Taylor's face into a concrete wall and later punched him twice in the jaw." *Id*. She further noted that the medical records "are insufficient to rebut the allegations," as "the dentist's observation that Taylor had three chipped teeth would seem to corroborate [Taylor's] version of events, or at least not controvert it," and thus, related "credibility determinations remain for the trier of fact." *Id*. With regard to Defendants' qualified immunity[2] argument, Judge Jackson found that because there remained a genuine dispute of material fact regarding whether Milburn and Null used excessive force on Taylor, and because the right to be free from excessive use of force by guards under the circumstances alleged in this case had been long-established as of June 2012, any "reasonable official would have understood that Milburn and Null's alleged actions violated Taylor's Eighth Amendment rights, so they are not entitled to qualified immunity." *Id*. at 11-12. Accordingly, Judge Jackson denied Milburn's and Null's motion for summary judgment, and set the matter for trial on August 15, 2016. *Id*., Docs. 132, 177, 184.

However, in the midst of the parties' trial preparation efforts, Plaintiff's counsel sought,

---

[2] "The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known. The dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. The qualified immunity analysis, thus, is limited to the facts that were knowable to the defendant officers at the time they engaged in the conduct in question. Facts an officer learns after the incident ends—whether those facts would support granting immunity or denying it—are not relevant." *Hernandez v. Mesa* 137 S. Ct. 2003, 2007 (2017) (citations omitted). The Court uses a two-pronged test to resolve qualified immunity issues. First, "the court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." *Id.* at 232 (citations omitted). Second, "the court must decide whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Id.* (quotation marks and citations omitted). If either prong is not satisfied, qualified immunity applies. *Id.* The Court is free to address the two prongs in either order. *Id.* at 236. "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589, 2018 WL 491521, at *11 (Jan. 22, 2018). "Once the predicate facts are established, the reasonableness of the official's conduct under the circumstances is a question of law." *Tlamka v. Serrell*, 244 F.3d 628, 632 (8th Cir. 2001) (citation omitted).

and was granted, leave to withdraw. *Id.*, Doc. 187. After his counsel's withdrawal, Plaintiff ceased to respond to or comply with various trial deadlines established in the Order Relating to Trial. Subsequently, Judge Jackson issued a Show Cause Order, in which she ordered Plaintiff to show cause as to why he should not be precluded from presenting evidence at trial for his failure to comply with the trial scheduling order. *Id.*, Doc. 202. Plaintiff responded to the Show Cause Order, arguing that he had been unable to obtain stamps and writing utensils. *Id.*, Doc. 204. Finding Plaintiff's response unpersuasive, on August 9, 2016, Judge Jackson sanctioned Plaintiff pursuant to Federal Rule of Civil Procedure 16(f)(1)(C), which allows a district court to issue sanctions on a party that "fails to obey a scheduling or other pretrial order," and dismissed the case without prejudice to Plaintiff's refiling. *Id.*, Docs. 207, 208. Plaintiff filed a motion to reconsider, which Judge Jackson denied on September 16, 2016. *Id.*, Docs. 210, 211. Plaintiff subsequently filed the instant action on January 19, 2017. (Doc. 1).

II. **LEGAL STANDARD ON SUMMARY JUDGMENT**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013). The movant "bears the initial responsibility of informing the district court of the basis for its motion" and must identify "those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.* at 324. In determining if a genuine issue of material fact is present, the court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986). Further, a court must give the

6

nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. Id. However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376–77 (8th Cir. 1996).

### III.   DISCUSSION

#### A.  Defendants' Motion for Summary Judgment

The Court will first address Defendants' motion for summary judgment. Defendants argue that Plaintiff failed to exhaust his intra-prison administrative remedies; that Plaintiff cannot prove that Defendants used excessive force against him in violation of the Eighth Amendment; and, that Defendants are entitled to qualified immunity on Plaintiff's claims. The legal arguments put forth by Defendants, as well as all of their supporting exhibits, are identical to those considered by Judge Jackson when she issued her prior Memorandum and Order dated July 22, 2015, in Case. No. 4:13-CV-1065-CEJ, in which she denied summary judgment on each of these theories. There is no new evidence presently before this Court that was not before Judge Jackson, and the relevant case law has not changed in any substantive or material manner. The undersigned finds no reason to disagree with Judge Jackson's thorough and well-reasoned opinion, and adopts Judge Jackson's analysis here. For the reasons stated in her Memorandum and Order, Defendants' motion for summary judgment is accordingly denied.

#### B.  Plaintiff's Motion for Adverse Inference

The Court will turn now to Plaintiff's motion for adverse inference. Plaintiff has requested preservation of and access to the prison's security footage from the date and time of the alleged

instances of use of excessive force. PCC's response to the intra-prison grievance Plaintiff filed reveals that video records existed of the areas in which the incidents allegedly occurred and for the timeframe in which they happened. However, while evidence indicates that such footage did exist,[3] it appears that the footage was destroyed in accordance with a routine retention policy, whereby the Missouri Department of Corrections' recording system writes-over such footage if it is not affirmatively preserved.[4] Plaintiff argues that Defendants should have been aware that litigation related to Plaintiff's complaints of unauthorized use of force was likely, and that the footage should have been preserved, as Plaintiff filed several timely complaints about the alleged abuse, and affirmatively requested the video footage on more than one occasion. Therefore, Plaintiff seeks sanctions for spoliation of evidence, in the form of an adverse inference instruction stating, "You may, but are not required to, assume that the contents of the security footage would have been adverse, or detrimental, to the Defendants." (Doc. 57 at 2). Plaintiff also asks the Court to refuse to permit testimony to rebut the adverse inference, as well as any testimony regarding the recordings' contents by any parties or non-parties who may have viewed the footage before its destruction. *Id*.

A court's discretionary power includes the "ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44–45 (1991); *see also Stevenson v. Union Pac. R.R. Co.,* 354 F.3d 739, 750 (8th Cir. 2004); *Ameriwood Indus.*

---

[3] In an undated "Informal Resolution Response," which was provided to Plaintiff in response to his informal complaint filed on the date of the incident, the findings state that "[v]ideo footage review did not show any wrong doing by staff and no use of force." (Doc. 32-6 at 8; Doc. 57-8). This document was signed by the Assistant Warden of PCC, the Functional Unit Manager of PCC, and the Investigating Staff Member who investigated Plaintiff's complaint.

[4] In the affidavit of Richard Jennings, the Warden at PCC, he states that "there are no video recordings" that show Plaintiff at PCC on either June 3, 2012, or June 4, 2012. (Doc. 57-21 at 1). Defendant Null, in a discovery response, stated that the security cameras "start to record over when the tapes are full," unless "a request is made to retrieve and save the video," and that he did not request that the video be saved "because no use of force occurred." (Doc. 57-19 at 2).

*v. Liberman*, No. 4:06CV524DJS, 2007 WL 5110313 at *4 (E.D.Mo. July 3, 2007). "District courts have inherent authority to impose sanctions when a party destroys evidence that it knows or should know is relevant to potential litigation and thereby prejudices its potential adversary." *Gordon v. Almanza*, No. 4:16-cv-00603, 2018 WL 2085223, at *1 (S.D. Iowa, Mar. 5, 2018) (quotations omitted). The purpose of sanctions is to prevent abuses of the judicial system, and to promote the efficient administration of justice. *Chambers*, 501 U.S. at 50-51. Among many different sanctions, the court may give a jury instruction on the "spoliation inference," which permits the jury to assume the destroyed evidence would have been unfavorable to the position of the offending party. Fed. R. Civ. P. 37(b)(2); *see also Moyers v. Ford Motor Co.*, 941 F.Supp. 883, 885 (E.D.Mo. 1996); *Liberman*, 2007 WL 5110313 at *4.

For "an adverse inference instruction for spoliation to be warranted, a district court is required to make two findings: (1) there must be a finding of intentional destruction indicating a desire to suppress the truth, and (2) there must be a finding of prejudice to the opposing party." *Lincoln Composites, Inc. v. Firetrace USA, LLC*, 825 F.3d 453, 463 (8th Cir. 2016); *see also Davis v. White*, 858 F.3d 1155, (8th Cir. 2017).

As to the first element, of intent, the Eighth Circuit has noted that "[i]ntent rarely is proved by direct evidence, and a district court has substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witnesses in a particular case, and other factors." *Morris v. Union Pac. R.R.*, 373 F.3d 896, 901 (8th Cir. 2004). "The ultimate focus for imposing sanctions for spoliation of evidence is the intentional destruction of evidence indicating a desire to suppress the truth," and not simply that the parties were aware of the prospect of litigation. *Greyhound Lines, Inc. v. Wade*, 485 F.3d 1032, 1035 (8th Cir. 2007).

In *Stevenson*, the Eighth Circuit addressed a situation that "tests the limits" of what actions qualify as intentional, or bad faith, destruction. *Stevenson*, 354 F. 3d at 747-48. In that case, the plaintiff was injured and his spouse killed in a collision with a train at a railroad crossing. *Id*. at 742. The defendant railroad destroyed a voice recording pursuant to its routine retention policy, even though it had general knowledge that such recordings would be important to any litigation in which an accident resulted in death or injury. *Id*. at 748. A claims representative for the railroad received notice of the accident shortly after it occurred and started an investigation. *Id*. at 747. The recording at issue was the only contemporaneous recording of the accident. *Id*. at 748. The court found that the "prelitigation destruction of the voice tape in this combination of circumstances, though done pursuant to a routine retention policy, creates a sufficiently strong inference of an intent to destroy it for the purpose of suppressing evidence of the facts surrounding the operation of the train at the time of the accident." *Id*.

With regard to the second element, prejudice, *Stevenson* is also particularly instructive. The Eighth Circuit explained that the "prejudice" requirement "is satisfied by the nature of the evidence destroyed in the case." *Id.* at 748. The court upheld sanctions even though "there [was] no indication that the [destroyed audio recording] could be classified as a smoking-gun," because "it was the only recording of conversations between the engineer and dispatch contemporaneous with the accident," and this unique nature of the evidence "rendered its loss prejudicial to the plaintiffs." *Id*. at 746.

Defendants argue that because the security footage from PCC was not in their individual custody or control and they did not personally destroy the video, responsibility for its spoliation may not be imputed to them. Defendants further argue that Plaintiff implicitly acknowledged that Defendants were not in possession or control of the footage, as his subpoena requests for the video

were directed not to Defendants, but to the Missouri Department of Corrections, ("MDOC"). Defendants further argue that they could not have reasonably foreseen that the video would be material to any potential legal action. They assert that "there was no indication that, in 2012, anyone at PCC or the MDOC could know that litigation was reasonably anticipated," in connection with this matter, because from their perspective, "there was no use of force, excessive or otherwise, and Plaintiff was not injured." (Doc. 60 at 13). Defendants also argue that there is not sufficient evidence that they intended to allow the destruction of evidence. Defendants finally assert, without any supporting argument, that "[n]o evidence exists that Plaintiff was prejudiced by his failure to obtain the video." *Id*. The Court will address each of Defendants' arguments in turn.

      i. Imputation

Defendants correctly note that neither of them had possession or control of the PCC video footage, and that neither personally destroyed evidence in this case. Defendants would have the Court conclude that Plaintiff has no remedy because of this. However, Plaintiff does not argue that Defendants personally had custody of the footage and affirmatively destroyed it. Rather, he alleges that Defendants failed to take any action to preserve the video footage after Plaintiff requested its preservation. Plaintiff further argues that the loss of evidence may be imputed to Defendants for purposes of resolving this motion for adverse inference.

Courts have imputed spoliation by the state or its agencies to named officer defendants in Section 1983 actions. *See, e.g., Peschel v. City of Missoula*, 664 F.Supp.2d 1137 (D.Mont. 2009) (granting spoliation sanction of default judgment against defendant officers because dashboard video of the arrest at the core of the claim was lost after being uploaded to a police department computer and viewed by several officers); *Kounelis v. Sherrer*, 529 F.Supp.2d 503 (D.N.J. 2008) (permitting an adverse inference instruction against a defendant after surveillance video evidence

of an alleged assault by prison guards was lost because it was never downloaded and recorded onto a videotape); *LaJocies v. City of North Las Vegas*, No. 2:08-cv-00606-GMN-GWF, 2011 WL 1630331, at *5 (D.Nev. April 28, 2011) (permitting adverse inference instruction against defendant officers where surveillance video and photographs of alleged prison assault were lost).

Defendants point to the Eighth Circuit decision in *Burris v. Gulf Underwriters Ins. Co.*, 787 F.3d 875 (8th Cir. 2015), to support their contention that the Court may not impute the destruction of evidence to parties who did not personally cause the alleged spoliation. In *Burris*, the Eighth Circuit stated in dicta that an adverse inference sanction was not appropriate against the defendant, Gulf, because the spoliation had been committed by a third party who was not involved in the suit, and Gulf at no time had any control over the evidence. However, *Burris* is distinguishable from the case at hand in two salient ways. First, the relationship between the defendant and the third-party who allowed the destruction of evidence in *Burris* is entirely different than exists here. In *Burris*, the third-party who destroyed the evidence was merely a former insurance company used by Gulf, whereas here, Defendants were employees of the third-party, MDOC, that had ultimate control of the video evidence. Second, in *Burris*, the court found that Gulf had no control over the evidence, and did not participate in the spoliation in even a tangential manner. Here, however, the evidence shows that Defendants had the ability to preserve the video by requesting its preservation.

The Court concludes that, although Defendants did not personally maintain or control the security video footage at PCC, that does not mean that Defendants lacked authority and responsibility to obtain the video or request that it be preserved. According to MDOC policy, only employees of PCC could have undertaken to preserve the video, and PCC employees, including Defendants, were aware that they must request the retrieval and preservation of video footage when

they thought it necessary. (Doc. 57-19). Under the circumstances in this case, the Court finds there is reason to impute the spoliation to Defendants, as they were in a position to have the video footage preserved, had reason to foresee its importance to potential litigation, and yet failed to request its preservation.

      ii. Foreseeability

As to whether Defendants could have reasonably foreseen that the video would be material to any potential legal action, the Court determines that Defendants should have foreseen the possibility of future litigation, and thus, should have realized the importance of preserving the video. On June 3, 2012, the very day of the incident, Plaintiff filed a grievance in which he asked that the security footage of the incident be preserved for federal review. (Doc. 57-7). Also on June 3, 2012, Plaintiff wrote a letter to the Inspector General's Office regarding the alleged unauthorized use of force against Plaintiff, in which he requested medical attention and assistance with his Informal Resolution Request. (Doc. 57-6). On July 10, 2012, Plaintiff wrote the Inspector General's Office a second time, again specifically requesting that the video evidence be preserved for court review. (Doc. 57-9). Further, during the month of June 2012, Plaintiff submitted multiple Medical Service Requests for treatment of his injuries allegedly sustained during the June 3, 2012, use of force, in which he described the incident that is the center of this dispute. (Docs. 57-10, 57-11, and 57-12). Also, during his first federal lawsuit against Defendants, Plaintiff sent a subpoena to the MDOC Custodian of Records seeking the security footage that would have recorded the incident. (Doc. 57-3). And yet, despite these numerous efforts to put Defendants, and the MDOC, on notice of his allegations of the unauthorized use of force, the video that captured the incident was nonetheless destroyed. It is difficult to imagine what more Plaintiff reasonably could have done to alert the PCC staff and the MDOC to the incident and the potential for future litigation.

13

As to Defendants' contention that no one at PCC or the MDOC could have foreseen that litigation was reasonably anticipated because, from their perspective after reviewing the video footage, there was no excessive use of force, the Court finds that argument to be both unpersuasive and problematic. Defendants, in effect, are asking the Court to take them at their word that, based on their own internal review of the now destroyed video recording, no use of excessive force occurred, notwithstanding Plaintiff's contemporaneous complaints that guards used excessive force during the recorded incident. The Court declines to accept Defendants' "trust-us-it-was-not-forseeable" argument because it might easily be perceived as giving prisons carte blanche to destroy any evidence that would be beneficial to prisoners' civil rights complaints, particularly, where, as here, there is no other objective evidence available.

      iii. Intent

As noted *supra*, the Eighth Circuit has stated, in the context of determining the level of intent required to invoke an adverse inference sanction, "[i]ntent rarely is proved by direct evidence, and a district court has substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witnesses in a particular case, and other factors." *Morris*, 373 F.3d at 901. Defendants argue that Plaintiff can provide no evidence of intent to deprive Plaintiff of information by destroying evidence. (Doc. 60 at 12). Plaintiff asserts that the situation here is analogous to *Stevenson*, where the Eighth Circuit upheld the imposition of an adverse inference sanction in circumstances similar to those examined in this case. *Stevenson*, 354 F.3d at 747.

As discussed above, in *Stevenson*, a train struck and killed the plaintiff's wife and injured the plaintiff. *Id*. at 742. A voice tape of the train crew and dispatch was recorded at the time of the accident, and the tape was the only contemporaneous recording. *Id*. at 747. The plaintiff

14

subpoenaed the railroad for a copy of the recording, but the railroad had recorded over the audio tape pursuant to its routine policy of reusing tapes after ninety days. *Id*. The district court found that although the train company's audio tape retention policy was not unreasonable or instituted in bad faith, it was unreasonable and amounted to bad faith, *i.e.*, intent to deprive the plaintiff of the evidence, for the defendant to adhere to the retention policy under those circumstances. *Id*. On appeal, the Eighth Circuit held that the district court's bad faith determination was justified, finding that "the pre-litigation destruction of the voice tape in this combination of circumstances, though done pursuant to a routine policy, creates a sufficiently strong inference of an intent to destroy it for purpose of suppressing evidence of the facts surrounding the operation of the train at the time of the accident." *Id*. at 748.

Here, much as in *Stevenson*, the security footage was the only contemporaneous recording of the alleged incident. Also similarly, Defendants had general knowledge that the security footage of the alleged excessive use of force against Plaintiff would be important to any litigation that would potentially ensue. Further, and unlike in *Stevenson*, where the railroad destroyed the audio tape long before it received a request to produce it, the video footage of the incident on June 3, 2012, was destroyed after Plaintiff had filed a grievance regarding the incident, and after he had specifically requested that the security footage be preserved. The Court finds that the circumstances of this case present an even more compelling case for concluding, as the Court did in *Stevenson*, that, "the destruction of the [video recording] in this combination of circumstances, though done pursuant to a routine policy, creates a sufficiently strong inference of an intent to destroy it for purpose of suppressing evidence," to warrant an adverse inference instruction for spoliation. *Id*. at 748; *see also Lincoln Composites*, 825 F.3d at 463 (for an adverse inference

instruction for spoliation to be warranted, a district court is required to find that there was intentional destruction indicating a desire to suppress the truth).

        iv. Prejudice

The loss of the only existing contemporaneous recording of the events in question prejudices Plaintiff. The lost footage would likely have been dispositive regarding the allegations in his claim. The video recorded the very events that Plaintiff claims constituted excessive force. The importance of the video footage is not lessened, nor can its loss be compensated for, by the fact that Plaintiff and Defendants can testify about these events at trial. The Court cannot ignore that Plaintiff is a convicted felon who would testify against uniformed corrections officers at trial. The video camera was an objective witness that bore neither the potentially pro-defense leanings of possible defense witnesses nor the credibility problems of Plaintiff. "The obvious inherent value of the video recording is that it would have allowed the jury, the arbiter of facts, to see the actual events unfold and make its own collective assessment as to whether the force used . . . was or was not reasonable under the circumstances," or indeed, whether the alleged use of force occurred at all. *Peschel v. City of Missoula*, 664 F.Supp.2d 1137, 1145 (D. Mont. 2009). "The jury would not be forced to rely on the conclusions drawn by the various witnesses as to the reasonableness of the force used. Rather the jury would have been able to form its own conclusions—unfiltered by the perceptions or sentiments of the various witnesses." *Id*. Plaintiff has plainly been prejudiced by the loss of this important and unique evidence. *See Stevenson*, 354 F.3d at 746 (because "it was the only recording of conversations between the engineer and dispatch contemporaneous with the accident", the unique nature of the evidence rendered its loss inherently prejudicial to the plaintiffs).

v. Appropriate Sanctions

The only remaining question, then, is the severity of the adverse inference instruction to be imposed as a sanction. There are "three types of adverse inference instructions: In its most harsh form . . . a jury can be instructed that certain facts are deemed admitted and must be accepted as true. At the next level . . . a court may impose a mandatory presumption, . . . [and the] least-harsh instruction permits (but does not require) a jury to presume that the lost evidence is both relevant and favorable to the innocent party." *Hall v. Ramsey Cnty.*, Civil No. 12-1915 (DSD/LIB), 2013 WL 12141435, at *3 (D. Minn., April 8, 2013). In the present case, Plaintiff seeks only the least-harsh instruction, as he asks that the jury be instructed that they "may, but are not required to, assume that the contents of the security footage would have been adverse, or detrimental, to the Defendants." The Court finds that request reasonable, and will grant Plaintiff's motion with regard to the specific instruction.

Plaintiff also asks the Court to prevent Defendant from presenting any rebuttal evidence to counter the inference. However, when imposing this least-harsh type of adverse inference instruction, courts generally allow the jury to also consider the spoliating party's rebuttal evidence, and then decide whether to draw an adverse inference. *See Stevenson*, 354 F.3d at 750 (a permissive adverse inference jury instruction for a party's destruction of evidence is subject to reasonable rebuttable); *see also Hall*, 2013 WL 12141435, at *3 (even the harsher mandatory presumption is generally considered to be rebuttable); *see also Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.,* 685 F.Supp.2d 456, 470 (S.D.N.Y. 2010) abrogated on other grounds by *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135 (2d Cir. 2012). The undersigned, despite Plaintiff's request that Defendants be entirely prevented from presenting

any rebuttal evidence, finds the general practice of allowing rebuttal evidence to be appropriate here, and will allow Defendants to offer such evidence.

As for Plaintiff's final request, that the Court prevent Defendants from presenting testimony from any person who reviewed the contents of the video footage before it was destroyed, this request appears to be moot, as Defendants have represented to the Court that the only person who viewed the footage is now deceased. (Doc. 60 at 12).

Consequently, pursuant to its inherent power, the Court grants in part and denies in part Plaintiff's motion for adverse inference.

### IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment shall be denied. Plaintiff's motion for adverse inference is granted in part and denied in part.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (Doc. 63) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Adverse Inference (Doc. 57) is **GRANTED in part and DENIED in part**.

*[signature]*

SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 25th day of September, 2019.